IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO
**Judge Wiley Y. Daniel**

Civil Action No. 05-cv-00569-WYD-PAC

GRANT PECK; and
DEAN SESSIONS,

Plaintiffs,

v.

PACIFIC CMA, INC., a Delaware corporation,

Defendant.

---

**FINDINGS OF FACT AND CONCLUSIONS OF LAW**

---

THIS MATTER came before the Court on a trial to the Court held May 14, 15, and 16, 2007. After considering the testimony of the witnesses, the credibility of the witnesses, the exhibits submitted, the arguments of counsel, and the parties' proposed findings of fact and conclusions of law, the Court enters the following Findings of Fact and Conclusions of Law.

I. FINDINGS OF FACT

A. Facts With Respect to Defendant PCMA

1. Defendant PCMA was incorporated as a Colorado corporation on December 30, 1994. (Ex. 5.)

2. A "blank check" company is a development stage company that has no specific business plan or purpose or has indicated in its business plan that it is to engage in a merger or acquisition with an unidentified company or companies,

other entity or person. (Ex. X-1; Testimony of Gary Joiner, Tr. at 32.)

3. Defendant PCMA was incorporated with the intent that it would be a "blank check" company and would seek, investigate and if warranted, acquire one or more properties or businesses through a reverse merger or similar type of transaction. (Ex. 5.)

4. By way of background, Mark DiSalvo was transferred 12,000,000 shares from PCMA in exchange for $2400.00 in cash and services (all outstanding shares in the Company) on the day of PCMA's incorporation in 1994. (Ex. D.)

5. On or about September 30, 1997, the Plaintiffs each acquired 2.5 million shares of Defendant PCMA stock when they purchased those shares from Mark DiSalvo, who was PCMA's sole shareholder at the time, in a private transaction. (Ex. D.) Gary Joiner, the Plaintiffs' business associate and attorney, acquired 4.6 million shares from Mark DiSalvo in this same transaction. Since these shares were acquired in a private transaction, the shares bear a restrictive legend that prevents the shares from being freely sold into the public marketplace pursuant to the Securities Act of 1933. (Testimony of Gary Joiner, Tr. at 27-29.)

6. The Plaintiffs acquired these shares in exchange for agreeing to implement PCMA's business plan. The business plan for PCMA was to find an operating company that wanted to be public without filing a registration statement under the Securities Act of 1933. (Ex. 5.)

7. Upon purchase of these PCMA shares from Mark DiSalvo, the Plaintiffs became

directors and officers of PCMA. (Testimony of Gary Joiner, Tr. at 50, 93.)

8. As of September 30, 1999, Plaintiff Peck gifted 19,750 shares of PCMA stock to family members, and Plaintiff Sessions gifted 11,000 shares of PCMA stock to family members. (Ex. D.)

9. The purpose of gifting PCMA shares to the Plaintiffs' family members was to increase the shareholder base of the company. Having additional shareholders was useful to PCMA in furthering its purpose of acquiring an operating business and then establishing a public trading market for its shares. Additionally, gifting the shares created a float, which establishes additional shareholders who are not affiliates of the company and who may sell their shares into the market. (Testimony of Gary Joiner, Tr. at 33, 110-112.)

10. On October 14, 1999, PCMA filed with the United States Securities and Exchange Commission a Form 10-SB under the Securities Exchange Act of 1934. This made PCMA subject to the reporting requirements of Section 13 of the Securities Exchange Act of 1934. Filing a 10-SB form is no substitute for filing the registration statement pursuant to the Securities Act of 1933. (Ex. 5; Testimony of Gary Joiner, Tr. at 34, 105, 107.)

11. On or about July 25, 2000, the Plaintiffs effected a reverse merger of PCMA with AGI Logistics, a Hong Kong freight forwarding company controlled by Alfred Lam. Mr. Lam's company (AGI Logistics) was subsumed by PCMA, which gained NASD approval to list its common stock on the Bulletin Board. (Testimony of Gary Joiner, Tr. at 40-45.)

12. A reverse merger occurs when the operating company is subsumed by the shell or blank check company. The net result is that a company that was once private becomes public. (Testimony of Gary Joiner, Tr. at 40-45, 90-91, 103.)

13. At the time of this reverse merger, the Plaintiffs and other shareholders sold a total of nine million shares of PCMA to Alfred Lam in a private transaction. Upon the sale of their shares to Mr. Lam, the Plaintiffs resigned from PCMA as officers and directors. (Testimony of Gary Joiner, Tr. at 40-47.)

14. Since 2000, Mr. Lam has been the control person of PCMA. (Testimony of Gary Joiner, Tr. at 190.)

15. On November 27, 2001, the Plaintiffs each returned 500,000 shares (of the PCMA shares which they owned) to PCMA for cancellation. (Testimony of Gary Joiner, Tr. at 48-50.)

16. The 128,438 shares owned by each Plaintiff (after returning 500,000 shares to PCMA) are the shares at issue in this case. (Ex. 2.)

17. In mid-2003, a request was made to PCMA to remove the restrictive legends from Plaintiffs' shares. PCMA refused. (Testimony of Grant Peck, Tr. at 235.)

B. Facts With Respect to Plaintiffs' Other Blank Check Companies

18. Until 2001, the Plaintiffs, along with their attorney and friend, Gary Joiner, were in the business of creating blank check companies. Mr. Joiner served as legal counsel and the Plaintiffs worked on negotiating potential mergers. (Testimony of Gary Joiner, Tr. at 85, 112-114.)

19. The Plaintiffs and Mr. Joiner formed between 10 to 20 blank check companies

with the intent of executing reverse mergers similar to the one that occurred in this case. Mr. Joiner filed 10-SB forms pursuant to the Securities Act of 1934 for each blank check company. The Plaintiffs and Mr. Joiner earned money in the blank check business by selling a controlling interest in the shell company and then retaining the shares. The shares gain value and then are sold. (Testimony of Gary Joiner, Tr. at 80-87, 98-102, 105-110.)

20. In 2001, the Plaintiffs and Mr. Joiner ceased their blank check business for the following two reasons: 1) the SEC filed a complaint against the Plaintiffs, Mr. Joiner, and Mark DiSalvo and 2) an SEC employee, Richard Wulff, issued an opinion letter which created confusion in the law. Mr. Joiner testified that the Wulff/Worm letter caused him uncertainty regarding the law, and this led (among other events) to the end of the aforementioned blank check business. (Testimony of Gary Joiner, Tr. at 80-87, 94-97.)

21. The opinion letter dated January 21, 2000, was written by Richard Wulff of the SEC to Ken Worm at the NASD. The letter responds to specific questions regarding the free trading status of securities initially issued by blank check companies. (Ex. X-1.)

22. On or about August 7, 2002, the SEC filed a complaint in the United States District Court of the Northern District of California against the Plaintiffs, Gary Joiner, and Mark DiSalvo alleging that they were all engaged in a scheme designed to evade the registration requirements of the Securities Act. The Plaintiffs consented to the entry of a permanent injunction which enjoined each

of them from future violations of the registration provisions of Sections 5(a) and 5(c) of the Securities Act. (Ex. C-1.)

II. CONCLUSIONS OF LAW

A. The Securities Act of 1933; Section 5 of the Securities Act

1. The essential purpose and intent of Congress in enacting the Securities Act was "to protect investors by requiring publication of certain information concerning securities before offered for sale." *A.C. Frost & Co. v. Coer D'Alene Mines Corp.*, 312 U.S. 38 (1941).

2. The general policy of the Securities Act is to provide full disclosure of every essentially important element pertaining to the distribution of securities. *Quinn v. SEC*, 452 F.2d 943, 946 (10th Cir. 1971).

3. Section 5 of the Securities Act provides that securities must be registered with the Securities and Exchange Commission before any person may sell or offer to sell such securities. 15 U.S.C. § 77e; *SEC v. Kern*, 425 F.3d 143, 147 (2nd Cir. 2005).

4. Specifically, Section 5 (a)(1) of the Securities Act reads:

> Unless a registration statement is in effect as to a security, it shall be unlawful for any person, directly or indirectly (1) to make use of any means or instruments of transportation or communication in interstate commerce or of the mails to sell such security through the use of medium of any prospectus or otherwise. . .

15 U.S.C. § 77e(a)(1).

5. The registration requirement of the Securities Act protects investors by promoting full disclosure of information thought necessary to the making of

informed investment decisions. *Geiger v. SEC*, 363 F.3d 481, 484 (C.A.D.C. 2004).

1. Exemptions to the Registration Requirements of Section 5 of the Securities Act of 1933

6. Section 4(1) of the Securities Act provides an exemption to the Section 5 registration requirements and outlines the types of transactions that are exempt. 15 U.S.C. § 77d(1).

7. These exemptions are designed to merely identify certain situations in which Congress considered the restrictions to be unduly burdensome. As such, the exemptions must be strictly construed as public policy strongly supports the registration of securities. Further, the party claiming the benefit has the burden of showing it falls within the exemption. *Quinn*, 452 F.2d at 946.

8. Specifically, section 4(1) provides exemptions for persons other than the issuer, underwriter, or dealer. 15 U.S.C. § 77d(1).

2. The Definition of Underwriter

9. An underwriter is defined in relevant part in Section 2(a)(11) of the Securities Act as:

> [A]ny person who has purchased from an issuer with a view to, or offers or sells for an issuer in connection with, the distribution of any security, or participates or has a direct or indirect participation in any such undertaking, or participates or has a participation in the direct or indirect underwriting of any such undertaking. . . . As used in this paragraph the term "issuer" shall include, in addition to an issuer, any person directly or indirectly controlled by the issuer, or any person under direct or indirect control with the issuer.

15 U.S.C. § 77b(a)(11).

10. The Tenth Circuit has interpreted this statutory definition and held that "the term underwriter is not limited to its common definition, but is rather a word of art. An underwriter is one who purchases stock from an issuer with an intent to resell to the public." *Quinn*, 452 F.2d at 946.

11. The Tenth Circuit has further defined underwriters as persons who received shares for redistribution and those who participated in that transaction. *Andrews v. Blue*, 489 F.2d 367, 374 (10th Cir. 1973).

12. Moreover, in *Eugene England Found. v. First Fed. Corp.*, 663 F.2d 988, 989-90 (10th Cir. 1973), the Tenth Circuit held that even if the original taking of stock was not with the intention to remove the transfer restriction, a party is an underwriter when he subsequently wished to remove the restriction in order to resell the stock to the public.

3. Rule 144 Under the Securities Act of 1933

13. In 1972, the SEC adopted Rule 144 under the Securities Act of 1933. 17 C.F.R. § 230.144.

14. Rule 144 "relates to the application of the registration provisions of the Act to the resale of securities acquired directly or indirectly from issuers or from affiliates of such issuers in transactions not involving any public offering (restricted securities) and securities held by affiliates." Rule 144 Adopting Release, 1972 WL 121583, at *1.

15. In other words, under Rule 144, affiliates (control persons) selling restricted or nonrestricted securities and nonaffiliates reselling restricted securities are not

considered to be engaged in a distribution and are, therefore, not deemed to be underwriters as defined in 15 U.S.C. § 77b(a)(11) if six conditions are satisfied:

(1) Current public information must be available about the issuer unless sales are limited to those made by nonaffiliates after two years. 17 C.F.R. § 230.144(a)(1).

(2) When restricted securities are sold, generally there must be a one year holding period. 17 C.F.R. § 230.144(c).

(3) When either restricted or non restricted securities are sold by an affiliate after one year, there are limitations on the amount of securities that may be sold. 17 C.F.R. § 230.144(e). When restricted securities are sold by nonaffiliates between the first and second years, there are identical limitations. *Id.* After two years, there are no volume limitations for resales by nonaffiliates. 17 C.F.R. § 230.144(k).

(4) Except for sales of restricted securities made by nonaffiliates after two years, all sales must be made in brokers' transactions as defined by § 4(4) of the Securities Act of 1933. 17 C.F.R. § 230.144(g).

(5) Except for sales of restricted securities made by nonaffiliates after two years, a notice of proposed sale must be filed for all sales in excess of 500 shares or with an aggregate sales price in excess of $10,000. 17 C.F.R. § 230.144(h).

(6) There must be a bona fide intention to sell. 17 C.F.R. § 230.144(l).

16. In the Rule 144 Release, the SEC further stated that

> [i]n view of the objectives and policies underlying the Act, the rule shall not be available to any individual or entity with

> respect to any transaction which, although in technical compliance with the provisions of the rule, is part of a plan by such individual or entity to distribute or redistribute securities to the public. In such case, registration is required.

Rule 144 Adopting Release, 1972 WL 121582, at *10. Moreover, the SEC stated that Rule 144 is unavailable when the transaction is part of fraudulent or deceptive practices in distributing or redistributing unregistered securities. *See Id.* at *11.

B. <u>Whether Plaintiffs Have Established that they are not Underwriters</u>

17. Turning to the case at hand, based on the evidence presented and the afore-mentioned authorities, I find that the Plaintiffs were underwriters within the meaning of the Securities Act of 1933.

18. First, PCMA was incorporated as a blank check company with the intent to enter into a reverse merger with an operating company. There is ample evidence that it was the practice of the Plaintiffs in conducting their blank check business to acquire shares of the blank check company, sell a controlling interest, and then retain the shares until they gained value. The Plaintiffs would then sell those shares for a profit. Thus, the Plaintiffs had the requisite intent to effect a distribution of the shares they acquired from the issuer, Mark DiSalvo, who was the sole shareholder of PCMA.

19. Second, the evidence showed that each Plaintiff was a control person of PCMA. "Control is not to be determined by artificial tests, but is an issue to be determined from the particular circumstances of the case." *SEC v. International*

*Chemical Development Corp. et al.*, 469 F.2d 20, *30 (10th Cir. 1972)( holding that although defendant was not an officer or director, his activities made him a control person).

20. Here, upon the initial purchase of the PCMA shares from Mark DiSalvo, the Plaintiffs both became directors and officers of PCMA. Further, the Plaintiffs actively participated in the process of discovering and securing an operating company with which to reverse merge. The Plaintiffs were also active participants in gifting shares to family members in order to create a float or increase the shareholder base of PCMA. This is further evidence of the Plaintiffs' intent to attract an operating company to merge with PCMA. The Plaintiffs carried out PCMA's ultimate business plan.

21. In sum, the evidence demonstrates that the Plaintiffs took from the issuer, Mark DiSalvo, with a view to distribution. Thus, the Plaintiffs became underwriters by operation of law, and no evidence was presented at trial to change this result.

22. I further find that there is ample evidence that the purpose of Plaintiffs' conduct was to evade the Section 5 registration requirements of the Securities Act. Specifically, Mr. Joiner's decision to file 10-SB forms pursuant to the Securities Act of 1934 for PCMA and 10 to 20 other blank check companies instead of registration statements pursuant to the Securities Act of 1933 is evidence of intent or a plan to evade the registration requirements of Section 5.

C. Whether Plaintiffs Have Established that they are not Entitled to a Rule 144(k) Exemption Under the Securities Act of 1933

23. The Plaintiffs claim an exemption from the registration requirements of Section 5

of the Securities Act pursuant to Rule 144(k). 17 C.F.R. § 230.144.

24. Specifically, the Plaintiffs argue that because they satisfy the factors set forth in Rule 144(k), they are not underwriters. Therefore, the restrictive legend should be removed from Plaintiffs' PCMA shares, and they should be able to freely sell their shares into the public marketplace. I disagree.

25. Rule 144(k) reads as follows:

> Termination of certain restrictions on sales of restricted securities by persons other than affiliates. The requirements of paragraphs (c), (e), (f) and (h) of this section shall not apply to restricted securities sold for the account of a person who is not an affiliate of the issuer at the time of the sale and has not been an affiliate during the preceding three months, provided a period of at least two years has elapsed since the later of the date the securities were acquired from the issuer or from an affiliate of the issuer. The two-year period shall be calculated as described in paragraph (d) of this section.

17 C.F.R. § 230.144(k).

26. Here, the Plaintiffs acquired the securities they now wish to sell in 1997. Thus, the holding period set forth in Rule 144(d) is satisfied.

27. Further, while Plaintiffs were affiliates of PCMA in 1997, their affiliate status terminated on August 28, 2000, when they resigned as officers and directors of PCMA. Thus, Plaintiffs, who had owned the shares since 1997, became eligible to sell those shares under Rule 144(k) on or about December 28, 2000, when they had not been affiliates of PCMA for at least three months.

28. However, in light of my earlier finding that the Plaintiffs were underwriters, Rule 144 is unavailable to them as an exemption from the registration requirements of

Section 5 of the Securities Act.

29. Although I could not locate any appellate opinion that speaks to this specific issue, I find that a combination of the following authorities supports my conclusion: (1) the SEC Release Adopting Rule 144(k); (2) the *Lybrand* decision; and (3) the Wulff/Worm Letters.

1. SEC Release Adopting Rule 144(k)

30. The SEC adopted Rule 144(k) in 1981. *See* Rule 144(k) Adopting Release, 1981 WL 96670. The release reads in pertinent part: "17 C.F.R. Part 230 is amended by revising paragraphs (e)(2), (f) and (h) of § 230.144 and adding paragraph (k) thereto to read as follows . . ." *Id.* at *12197. As such, the adoption of Rule 144(k) does not abrogate the original provisions set forth in Rule 144 when it was released in 1972. Therefore, as I previously cited from the 1972 release, the safe harbor of Rule 144 remains unavailable to persons who achieve underwriter status. Therefore, Plaintiffs are not eligible to rely on Rule 144(k) as an exemption to the registration requirements since I have determined that they are underwriters.

2. The *Lybrand* Decision

31. I find the analysis of the district court in *SEC v. Lybrand*, 200 F.Supp.2d 382 (S.D.N.Y. 2002) to be persuasive. In *Lybrand*, the Securities and Exchange Commission brought an action against the defendants for alleged violations of the securities laws in connection with the public sale of shares in several shell companies. The *Lybrand* Court held that the founders of the shell corporations

were both underwriters liable under the Securities Act for sales of unregistered securities and affiliates ineligible for an exemption under Rule 144. *Id.* Further, the *Lybrand* Court stated the following with respect to Rule 144:

> The purpose of Rule 144 is to provide clear guidelines to investors who wish to trade restricted securities, not to serve as a springboard for convoluted *post hoc* arguments by affiliates seeking to justify an impermissible transaction. In interpreting exemptions to Section 5, courts look to the statutory purpose of promoting adequate disclosure to the investing public, rather than engage in strangulating literalism.

*Id.* at 397.

3. <u>The Wulff/Worm Letters</u>

32. In an interpretive letter dated January 21, 2000, Richard K. Wulff, Chief of the Office of Small Business for the SEC, concluded that the resale of securities of blank check companies are restricted, and such securities can be resold only through the registration provisions under the Securities Act. Mr. Wulff further states that the "transactions in black check company securities by their promoters or affiliates, especially where they control or controlled the float of the freely tradable securities, are not the kind of ordinary trading transactions between individual investors of securities already issued that Section 4(1) [Rule 144] was designed to exempt." (Ex. X-1, p. 2.)

33. Moreover, Mr. Wulff states that when the SEC believes a scheme exists to avoid the registration requirements of the Securities Act, a rule 144 exemption is unavailable, and the shares require registration. *Id.*

34. Although Mr. Wulff also states that his conclusions are based on specific factual

scenarios and may change based on different facts or conclusions, I find his positions persuasive.

35. While SEC interpretive or no-action letters do not change substantive law and are not binding on courts, they may be treated as persuasive. *See New York Employees' Ret. Sys. v. SEC*, 45 F.3d 7, 13 (2nd Cir. 1995).

III. CONCLUSION

1. In conclusion, based upon the foregoing reasons, I find that the Plaintiffs did not satisfy their burden of proving that they are eligible for an exemption to the registration requirements of the Securities Act of 1993.

2. Based on the evidence and the cited authority, I find that Plaintiffs are underwriters, and therefore, are not subject to the exemption set forth in Rule 144(k).

3. Further, the Plaintiffs failed to present any convincing authority in support of their argument that if they satisfy the factors set forth in Rule 144(k), they should not be deemed underwriters. This argument is unpersuasive and contrary to the congressional purpose underlying the Securities Act of 1933.

4. My finding that the Plaintiffs are underwriters and therefore ineligible for an exemption under Rule 144 supports the intent of Congress in promulgating the Securities Act of 1933. The Act is intended to promote full disclosure and protect investors. Allowing the Plaintiffs to circumvent the requirements of the Act absent any persuasive authority would not be a just result.

5. Therefore, since the Plaintiffs are underwriters, the Defendant is under no duty to remove the restrictive legend from Plaintiffs' shares of PCMA.

Based upon the foregoing, I find in favor of the Defendants on all claims and order the Entry of Judgment consistent with this Order.

Dated: June 1, 2007

BY THE COURT:

s/ Wiley Y. Daniel
Wiley Y. Daniel
U. S. District Judge